**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| **INTERDIGITAL, INC., and DRNC HOLDINGS, INC.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**AMAZON.COM, INC.; AMAZON WEB SERVICES, INC.,**<br><br>**Defendants.** | **Civil Action No. 7:26-cv-00064**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs InterDigital, Inc. and DRNC Holdings, Inc. (collectively "Plaintiffs" or "InterDigital") brings this action for patent infringement against defendants Amazon.com, Inc. ("Amazon") and Amazon Web Services, Inc. ("AWS Inc.") (collectively "Defendants"). Plaintiffs, on personal knowledge as to their own acts, and on information and belief as to all other matters based on diligent investigation, allege as follows:

## NATURE OF THE ACTION

1.      Defendants have directly infringed, and continue to infringe, the following issued, valid, and enforceable United States Patents: U.S. Patent No. 7,921,259 ("the '259 Patent"); U.S. Patent No. 10,116,565 ("the '565 Patent"); U.S. Patent No. 8,745,128 ("the '128 Patent"); U.S. Patent No. 9,015,416 ("the '416 Patent"); U.S. Patent No. 8,868,701 ("the '701 Patent"); and U.S. Patent No. 8,583,769 ("the '769 Patent"); (collectively, the "Asserted Patents"). The Asserted Patents are attached hereto as Exhibits 1–6. Plaintiffs accordingly file this Complaint to obtain judgment and relief for Defendants' persistent and pervasive infringement of the Asserted Patents.

1

2.      Defendants are not authorized to use InterDigital's Asserted Patents. This Complaint is therefore necessary to put an end to Defendants' infringing conduct. Today, Defendants continue their widespread infringement of the Asserted Patents by making, using, selling, offering to sell, operating, and providing infringing services, including, for example, the Amazon Prime streaming video services as well as Amazon Fire and Kindle eReader devices and software applications. These infringing instrumentalities make use of at least the Amazon CloudFront content delivery network ("CDN"), edge PoP ("Points of Presence"), embedded PoP, associated regional edge caches, Origin Shield, Lambda@Edge, Route 53 DNS routing, AWS Systems Manager, MediaPackage origins, and other AWS infrastructure.[1] Amazon implements and profits from these CDN-related infringing services, products, and infrastructure without permission or license from InterDigital. Defendants derive massive commercial value from these infringing technologies, including improved performance, scalability, and reliability of its video and content delivery services and operations.

3.      AWS Inc. is a wholly owned subsidiary of Amazon. Amazon operates, manages, and relies on AWS Inc. systems to make, use, sell, offer for sale, and import certain products and services in the United States. Alleged acts of infringement can be traced directly to Amazon through its assertion of management, control, and interference with AWS Inc.'s operations in a manner that surpasses control incident to ownership alone. Amazon offers products and services

---

[1] Defendants' services and products delivered in whole or in part via Amazon CloudFront and its associated features and services comprise the "Accused Instrumentalities." The Accused Instrumentalities in this case include Amazon Prime Video on Demand and Amazon Prime Video Live delivered through Amazon's CloudFront CDN. Content in the CDN is provided over Amazon's edge PoPs, embedded PoPs, regional edge cache, origin servers, and the AWS backbone. The Accused Instrumentalities include services such as Amazon S3, CloudFront, AWS Elemental MediaPackage, API Gateway, and Elastic Load Balancing. The Accused Instrumentalities include functionality and devices implementing said functionality such as Origin Shield, Lambda@Edge, Route 53 DNS routing, and the AWS Management Console. The Accused Instrumentalities also include the Amazon hardware ecosystem utilizing Amazon's CloudFront CDN including Fire Tablets, Echo and Echo Show devices, Fire TV devices, and Kindle devices as well as all variations of the listed devices.

that rely on, use, and interoperate with AWS infrastructure, such as the Accused Instrumentalities. On information and belief, there exists and at all relevant times has existed a unity of interest, ownership, and control between Amazon and AWS Inc. that would make recognition of their separate corporate forms a fraud, promote injustice, and result in an inequitable outcome.

## THE PARTIES

4.      Plaintiff InterDigital, Inc. is a Pennsylvania corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, DE 19809. InterDigital has employees all over the world including employees in this District and across the state of Texas.

5.      Plaintiff DRNC Holdings, Inc. is a Delaware corporation with its principal place of business at 200 Bellevue Parkway, Suite 300, Wilmington, Delaware 19809. Plaintiff DRNC Holdings, Inc. is a wholly owned subsidiary of Interdigital, Inc.

6.      Defendant Amazon Web Services, Inc. ("AWS Inc.") is a corporation organized under the laws of the State of Delaware and, on information and belief, has a principal place of business at 410 Terry Avenue North, Seattle, Washington 98109. AWS Inc. is a wholly-owned subsidiary of Amazon.com, Inc. ("Amazon"). AWS Inc. may be served through Texas Registered Agent: Corporation Service Company dba CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

7.      Defendant Amazon.com, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 410 Terry Ave, North Seattle, WA, 98109. Amazon may be served through its Texas Registered Agent: Corporation Service Company dba CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

8.      This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.

9.      This Court has personal jurisdiction over Defendants because Defendants have committed acts of infringement within this District, have purposefully availed themselves of the rights and benefits of Texas law, conduct substantial business in this District, and derive substantial revenue from the operation, sale, and/or use of their Accused Instrumentalities, including their Amazon CloudFront content delivery network delivering content such as Prime Video and VOD to various Amazon devices, within Texas and the Western District of Texas. Defendants also maintain established places of business within this District for the purposes of distributing, maintaining, selling, and offering to sell the Accused Instrumentalities including the accused hardware devices that rely on, interoperate with, and support the AWS CDN network.

10.     Defendants Amazon and AWS Inc. both maintain regular and established places of business throughout Texas and in this District, including offices housing, on information and belief, hundreds of employees in Austin;[2] fulfillment centers in Austin,[3] San Antonio,[4] and El Paso;[5] and hubs throughout Texas and in this District. The fulfillment centers are locations of business from which Accused Instrumentalities (in particular the accused hardware devices) are sold, offered for sale, used, and/or provided to customers and retailers. On information and belief, Defendants' make and use Cloudfront and other CDN architecture in conducting business at the regular and established places of business in Texas and in this District.

11.     AWS Inc. maintains corporate offices and technical staff in the Western District of Texas (11815 Alterra Parkway, Austin, Texas) where it provides cloud consulting, support, and

---

[2] Source: Amazon Plans to Create 2,000 New Tech Jobs at Austin Tech Hub (https://www.builtinaustin.com/articles/amazon-2000-new-jobs-austin-hiring); Largest Tech Employers in the Austin Area (https://www.bizjournals.com/austin/subscriber-only/2025/02/14/largest-tech-employers-in-the-austin-area.html).
[3] Source: Amazon Fulfillment Center HAU1 (https://www.mapquest.com/us/texas/amazon-fulfillment-center-hau1-461490472)
[4] Source: Amazon New Fulfillment Center Ready to Add More Workers (https://www.connectcre.com/stories/amazon-new-fulfillment-center-ready-to-add-more-workers/)
[5] Source: Amazon Fulfillment Center (https://www.mapquest.com/us/texas/amazon-fulfillment-center-472545625)

other professional services to Texas customers.[6] Amazon maintains at least 3 corporate offices in this District as well (11501 & 11601 Alterra Parkway and 11801 Domain Blvd, Austin, Texas).

12.     On information and belief, Amazon employs approximately 86,500 people in Texas.[7]

13.     Venue is proper in this District under 28 U.S.C. § 1400(b) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (c). Defendants Amazon.com and AWS Inc. are both registered to do business in Texas. Defendants both have transacted business in this District and have committed acts of direct and indirect infringement in this District by, among other things, making, using, offering to sell, selling, and importing products that infringe the Asserted Patents.

14.     Amazon maintains regular and established places of business in this District, including the corporate offices and fulfillment centers described above, that are staffed by Amazon personnel who conduct Amazon's business on a continuous basis.

15.     Amazon, directly and/or through subsidiaries or intermediaries, has committed and continues to commit acts of infringement in this District by, among other infringing acts: (a) selling and offering for sale in this District the Accused Instrumentalities, including Amazon Fire, Amazon Echo, FireTV, and Kindle eReader devices and associated software applications, and (b) using, operating, and providing the Accused Instrumentalities, including Prime Video and related streaming services to users in this District, including through instructions and materials that encourage and enable customers in this District to use the Accused Instrumentalities in an infringing manner.

---

[6] Source: Amazon Tech Hub to Occupy 145K SF at Domain 10 (https://www.connectcre.com/stories/amazon-tech-hub-occupy-145k-sf-domain-10/); Delivery Consultant – Data Architect, AWS Professional Services (https://www.amazon.jobs/en/jobs/3143881/delivery-consultant-data-architect-aws-professional-services-aws-professional-services-aws-professional-services); Principal ProServe Cloud Architect (https://www.amazon.jobs/en/jobs/3177293/principal-proserve-cloud-architect).
[7] Source: Amazon Employees by State 2026 (https://worldpopulationreview.com/state-rankings/amazon-employees-by-state)

16.    AWS Inc. and its affiliates maintain regular and established places of business in this District, including the corporate office described above that is staffed by employes and agents who conduct business on a continuous basis, as well as multiple data centers containing servers that are used to provide the accused cloud services.

17.    On information and belief, AWS Inc. operates at least three of these data centers containing servers in San Antonio (at 7400 Potranco Rd, 11625 Old Corpus Christi Highway, and 12807 Donop Road).[8] These San Antonio data centers are actively operated facilities that form part of AWS Inc.'s business in this District. AWS Inc. staffs and manages these facilities through on-site employees, including data-center operations staff,[9] engineers,[10] and security personnel.[11] In addition, AWS Inc. uses these data centers to provide revenue-generating cloud services to customers, including hosting, caching, routing, content delivery, and other related AWS services.[12] Many of these customers, including Airbnb[13] and Disney+,[14] use AWS Inc.'s infringing systems in this District to provide their streaming and other online services. These ongoing business activities surrounding the San Antonio data centers constitute more than mere passive server presence and reflect AWS Inc.'s regular and established business operations in this District.

---

[8] Source: With UT sale, cluster of data centers on West Side continues to grow (https://sanantonioreport.org/with-ut-sale-cluster-of-data-centers-on-west-side-continues-to-grow/); Amazon ALE061 (https://baxtel.com/data-center/amazon-ale061); Amazon AWS: 7400 Potranco Rd (https://www.datacenters.com/amazon-aws-7400-potranco-rd); Amazon AWS: 12807 Donop Rd (https://www.datacenters.com/amazon-aws-12807-donop-rd)
[9] Source: Data Center Operations Site Manager (https://www.linkedin.com/jobs/view/4332795411/)
[10] Source: Data Center Chief Engineer (https://www.linkedin.com/jobs/view/data-center-chief-engineer-adc-infraops-dceo-at-amazon-web-services-aws-4371011139/)
[11] Source: Data Center Physical Security Manager(https://www.linkedin.com/jobs/view/data-center-physical-security-manager-us-adc-data-center-security-at-amazon-web-services-aws-4303747748/)
[12] Source: Deliver Content Faster with Amazon Cloudfront Hand-On Tutorial at 1 (https://docs.aws.amazon.com/pdfs/hands-on/latest/deliver-content-faster/deliver-content-faster.pdf); Make and Impact for Every Customer (https://www.amazon.jobs/content/en/teams/amazon-web-services/data-centers); Amazon Cloudfront Pricing (https://aws.amazon.com/cloudfront/pricing/); AWS Global Infrastructure (https://aws.amazon.com/about-aws/global-infrastructure/)
[13] Source: AirBnB on AWS (https://aws.amazon.com/solutions/case-studies/innovators/airbnb/)
[14] Source: The Walt Disney Company Uses AWS to Support the Global Expansion of Disney+ (https://press.aboutamazon.com/2021/4/the-walt-disney-company-uses-aws-to-support-the-global-expansion-of-disney)

18.     Defendants own and operate Annapurna Labs in Austin, Texas, where AWS engineers design and test custom chips used in Amazon data centers.[15] Annapurna Labs developed theNitro and the Gravitron processors, both of which, on information and belief, underpin server hardware deployed across AWS's infrastructure.[16]

19.     Upon information and belief, AWS Inc. uses the above-described data centers and offices in this District to host, develop, support, and deliver the accused infringing AWS cloud services—including Amazon CloudFront, embedded and edge POPs, associated regional edge caches, Origin Shield, Lambda@Edge, Route 53 DNS routing, AWS Systems Manager, MediaPackage origins, and other AWS infrastructure—to customers in this District,[17] and Defendants derive substantial revenue in this District as a result of this infringement.

20.     Amazon CloudFront delivers content through a distributed network of servers located within PoPs. In addition to traditional PoPs, CloudFront operates "embedded PoPs" (edge locations embedded within or near access networks) that cache and deliver content closer to end users and perform CDN functions.[18]

21.     Amazon CloudFront owns and operates at least one of these embedded PoPs within this District, specifically in the Austin area.[19] On information and belief, when users in this District

---

[15] Source: Follow Us Into the Lab Where AWS Designs Custom Chips (https://www.aboutamazon.com/news/aws/take-a-look-inside-the-lab-where-aws-makes-custom-chips)
[16] Source: How AWS's own silicon and software deliver cloud scalability (https://journal.uptimeinstitute.com/how-awss-own-silicon-and-software-deliver-cloud-scalability/)
[17] Source: Cloud services for the State of Texas Department of Information Resources (https://aws.amazon.com/contract-center/cloud-services-for-the-state-of-texas/); AWS Rockfish: Planning documents reveal three Amazon data centers in Texas (https://www.datacenterdynamics.com/en/news/aws-rockfish-planning-documents-reveal-three-amazon-data-centers-in-texas/); Where is Amazon Web Services's Headquarters? Main Office Location and Global Offices (https://www.clay.com/dossier/amazon-web-services-headquarters-office-locations);
[18] Source:  https://aws.amazon.com/blogs/networking-and-content-delivery/bringing-delivery-closer-to-end-users-with-amazon-cloudfront-embedded-pops/
[19] Source: CloudFront Points of Presence (PoPs) https://aws.amazon.com/cloudfront/features/; https://aws.amazon.com/blogs/networking-and-content-delivery/bringing-delivery-closer-to-end-users-with-amazon-cloudfront-embedded-pops/

request content delivered via the Accused Instrumentalities (including Prime Video VOD and Prime Video Live), those requests are served, at least in part, through the one or more embedded PoPs located in this District. These one or more PoPs perform infringing functionality and steps within this District, including caching and delivering content, validating and refreshing cached content, maintaining and using pre-established network connections, and applying configuration updates propagated through CloudFront's control plane, as reflected in the Asserted Patents and the infringement charts attached as Exhibits 7–12.

22.     Accordingly, as set forth above, Defendants commit acts of infringement in this District.

23.     Recent AWS Inc. job postings further indicate that AWS Inc. maintains a regular and established place of business and conducts substantial operations in this District, including infrastructural, operational, and customer-facing activities that support and enable the Accused Instrumentalities. A few examples include:

    a.  Embedded Software Development Engineer II, AWS Hardware Engineering Services (focused on building "server related firmware," where "the AWS Firmware team drives system innovation in the servers used by all of Amazon Web Services, including EC2, S3, CloudFront, etc.");[20]

    b.  Senior Delivery Consultant - Application Modernization, AWS Professional Services (focused on customer implementation of AWS architectures, where AWS personnel "design, implement, and manage AWS solutions," "lead the implementation process," and "create reusable artifacts" to support customer

---

[20] Source: Embedded Software Development Engineer II, AWS Hardware Engineering Services (https://www.amazon.jobs/en/jobs/3129969/embedded-software-development-engineer-ii-aws-hardware-engineering-services)

operation of AWS infrastructure services including EC2, S3, Lambda, VPC, and CloudFormation);[21]

    c.   Sr. Product Manager, AWS Server Supply Chain (focused on the "design, planning, delivery, and operation of all AWS global infrastructure," including leading manufacturing operations and supply-chain strategies for AWS server hardware— including servers, networking, and related components—used across AWS data centers to "keep the cloud running" and provide "seemingly infinite capacity" to customers);[22] and

    d.   Senior Hardware Development Engineer, AWS AI & ML, Accelerator Servers (focused on being the "end to end owner" of accelerated servers, including "owning the design and operations," working with partners to "root cause failures," and making "closed loop corrective actions" that feed back into "current & future designs," and "integrating firmware/software stacks on top of the hardware").[23]

24.    This small sample of job postings, among many others, confirm AWS Inc.'s continuous physical presence in this District and its ongoing business operations here, including activities that support and enable AWS Inc.'s Accused Instrumentalities.

## INTERDIGITAL'S ASSERTED PATENTS

25.    On April 5, 2011, the PTO issued U.S. Patent No. 7,921,259 (the "'259 Patent"), titled "Content Network Global Replacement Policy." The '259 Patent lists Lior Elazary, Alex

---

[21] Source: Senior Delivery Consultant - Application Modernization, AWS Professional Services(https://www.amazon.jobs/en/jobs/3112727/senior-delivery-consultant-application-modernization-aws-professional-services)

[22] Source: Sr. Product Manager, AWS Server Supply Chain (https://www.amazon.jobs/en/jobs/3117342/sr-product-manager-aws-server-supply-chain)

[23] Source: Senior Hardware Development Engineer AWS AI & ML, Accelerator Servers (https://www.amazon.jobs/en/jobs/3129963/senior-hardware-development-engineer-aws-ai-ml-accelerator-servers)

Kazerani, and Jay Sakata as its inventors. Attached hereto as Exhibit 1 is a true and correct copy of the '259 Patent.

26.     All rights, title, and interest in the '259 Patent are held by DRNC Holdings, Inc., including through a chain of title culminating in an assignment from Edgio, Inc. to DRNC Holdings, Inc. dated January 5, 2025 (recorded January 30, 2025). DRNC is the owner of the '259 Patent with the right to sue and recover for infringement.

27.     On October 30, 2018, the PTO issued U.S. Patent No. 10,116,565 (the "'565 Patent"), titled "End-to-End Acceleration of Dynamic Content." The '565 Patent lists Jason Hofmann as its inventor. Attached hereto as Exhibit 2 is a true and correct copy of the '565 Patent.

28.     All rights, title, and interest in the '565 Patent are held by DRNC Holdings, Inc., including through a chain of title culminating in an assignment from Edgio, Inc. to DRNC Holdings, Inc. dated January 5, 2025 (recorded January 30, 2025). DRNC is the owner of the '565 Patent with the right to sue and recover for infringement.

29.     On June 3, 2014, the PTO issued U.S. Patent No. 8,745,128 (the "'128 Patent"), titled "Optimized Content Distribution Based on Metrics Derived from End User." The '128 Patent lists Alexander Kazerani, Robert J. Peters, and Jayson G. Sakata as its inventors. Attached hereto as Exhibit 3 is a true and correct copy of the '128 Patent.

30.     All rights, title, and interest in the '128 Patent are held by DRNC Holdings, Inc., including through a chain of title culminating in an assignment from Edgio, Inc. to DRNC Holdings, Inc. dated January 5, 2025 (recorded January 30, 2025). DRNC is the owner of the '128 Patent with the right to sue and recover for infringement.

31.     On April 21, 2015, the PTO issued U.S. Patent No. 9,015,416 (the "'416 Patent"), titled "Efficient Cache Validation and Content Retrieval in a Content Delivery Network." The '416

Patent lists Andrew Lientz as its inventor. Attached hereto as Exhibit 4 is a true and correct copy of the '416 Patent.

32.    All rights, title, and interest in the '416 Patent are held by DRNC Holdings, Inc., including through a chain of title culminating in an assignment from Edgio, Inc. to DRNC Holdings, Inc. dated January 5, 2025 (recorded January 30, 2025). DRNC is the owner of the '416 Patent with the right to sue and recover for infringement.

33.    On October 21, 2014, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 8,868,701 (the "'701 Patent"), titled "Configuration Management Repository for a Federation of Distributed Platforms." The '701 Patent lists Robert J. Peters, Lior Elazary, and Jayson G. Sakata as its inventors. Attached hereto as Exhibit 5 is a true and correct copy of the '701 Patent.

34.    All rights, title, and interest in the '701 Patent are held by DRNC Holdings, Inc., including through a chain of title culminating in an assignment from Edgio, Inc. to DRNC Holdings, Inc. dated January 5, 2025 (recorded January 30, 2025). DRNC is the owner of the '701 Patent with the right to sue and recover for infringement.

35.    On November 12, 2013, the PTO issued U.S. Patent No. 8,583,769 (the "'769 Patent"), titled "Configuration Management Repository for a Distributed Platform." The '769 Patent lists Robert J. Peters, Lior Elazary, and Jayson G. Sakata as its inventors. Attached hereto as Exhibit 6 is a true and correct copy of the '769 Patent.

36.    All rights, title, and interest in the '769 Patent are held by DRNC Holdings, Inc., including through a chain of title culminating in an assignment from Edgio, Inc. to DRNC Holdings, Inc. dated January 5, 2025 (recorded January 30, 2025). DRNC is the owner of the '769 Patent with the right to sue and recover for infringement.

## FACTUAL BACKGROUND

**A.    InterDigital/DRNC Holdings And Its Persisting Innovation**

37.    InterDigital is one of the most successful and innovative research and development companies of the last half century, both domestically and globally. As a dynamic and groundbreaking engineering company, for more than fifty years InterDigital has been at the forefront of developing foundational video, wireless communication, and other digital technologies.

38.    Every year, InterDigital pours a massive amount of money into its world-class research and IP portfolio development engine. For example, in the most recently reported fiscal year alone, InterDigital reinvested well over nine figures—a sum representing nearly 50% of its recurring revenues—back into this cycle of innovation. At its facilities throughout the United States, and its bespoke video research laboratories in Rennes, France, InterDigital researches, develops, engineers, and progresses advanced innovations numerous cutting-edge technologies, including wireless, video, and networking. As discussed in further detail below, InterDigital designs and develops a range of key technologies instrumental to advancing technology and innovating the products people use every day.

39.    InterDigital and its employees' technical contributions have been recognized all over the world. Its employees have held or currently hold more than 100 significant leadership positions on global industry-leading technology development and standard setting bodies. InterDigital has also won many awards for its technical discoveries. As just one example, InterDigital has been named as one of the world's 100 most innovative businesses by LexisNexis for the past three years.[24] To enable and fund its future research and development efforts,

---

[24] Source: Innovation Momentum 2022: The Global Top 100 (https://go.lexisnexisip.com/hubfs/~IP%20-%20Intellectual%20Property%20Files/IP%20-

InterDigital relies on obtaining fair compensation for its novel contributions to technological advancements in multiple industry segments.

40.    In addition to its state-of-the-art video lab—where Interdigital leads research that enables new devices and rich multimedia experiences, InterDigital is an active and ongoing innovator in the cloud, edge, network, and content delivery architectures that underpin modern digital services. Consistent with its decades-long focus on solving complex, systems-level performance and reliability challenges, InterDigital's current research efforts are directed at technical problems addressed by the Asserted Patents—namely, how content and content-distribution configurations are efficiently distributed, controlled, and adapted across geographically dispersed networks to meet demanding performance, latency, jitter, and reliability requirements.

41.    Today, InterDigital researchers are actively developing technologies that enable intelligent, AI-assisted services operating across cloud, edge, and device environments. This research relates to—and builds upon—architectural concepts associated with content delivery networks. For example, InterDigital's ongoing work in media services explores predictive and learning-based techniques that adapt media traffic flows and system resource allocation using artificial intelligence. These technologies are designed to optimize delivery paths, reduce latency and jitter, and improve user experience.

---

%20PatentSight/2022%20Innovation%20Momentum%20Report/LexisNexis%20Innovation%20Momentum%20Report%202022.pdf); Innovation Momentum 2023: The Global Top 100
(https://www.lexisnexisip.com/wp-content/uploads/2024/02/LexisNexisInnovation-Momentum-Report-2023.pdf);
Innovation Momentum 2024: The Global Top 100 (https://go.lexisnexisip.com/hubfs/LexisNexis-Innovation-Momentum-Report-2024.pdf)

42. InterDigital is also conducting research into spatially aware and context-driven services, which enhance wireless and media delivery by incorporating awareness of user location, device characteristics, and environmental factors.

43. In addition, InterDigital researchers are advancing multimodal sensing and coordination technologies, which involve orchestrating video, wireless, and sensing tasks across distributed systems to increase precision, efficiency, and responsiveness. These efforts depend on synchronized data collection, processing, and management of services across multiple computing nodes.

44. More broadly, InterDigital's research includes optimizing the connectivity and computing architecture used to deliver latency-sensitive applications, including next-generation AI-driven services, traffic characterization, immersive media, and real-time interactive experiences. InterDigital's research also aligns with the media delivery architecture of 6G design concepts being defined by the 3rd Generation Partnership Project (3GPP), a consortium of international telecommunications standard development organizations. InterDigital's work enhances end-to-end service quality for media services. This work emphasizes flexible adaptation of computing and network resources to meet stringent performance requirements. Such architectures depend on processing capabilities, efficient cache validation, intelligent routing, pre-established communication paths, and centralized control of distributed infrastructure.

45. Through this ongoing research and development, InterDigital continues to invest resources in advancing the state of the art in distributed content delivery, edge computing, and network-controlled media services. As further evidence of its continued investment, Interdigital purchased a portion of Edgio (formerly Limelight Networks) IP portfolio in early 2025. A significant portion of this portfolio, including the Asserted Patents, reflect foundational aspects of

content delivery networks (CDNs), edge computing, and streaming media that remain directly relevant to—and actively inform—InterDigital's present-day research agenda and its contributions to modern cloud and edge-based systems.

**B.    Amazon Prime Video and Amazon Video-on-Demand Services**

46.    Amazon operates large-scale digital video distribution services under the Amazon Prime Video and Amazon Video-on-Demand ("Amazon VOD") brands. Through these services, Amazon offers subscription-based and transactional access to on-demand movies, television programs, original series, and live or near-live programming delivered over the Internet.[25] Amazon markets Prime Video as a core digital entertainment service available to users throughout the United States, including users located in Texas and within this District.

47.    Amazon Prime Video and Amazon VOD deliver video content to users on a wide range of Internet-connected devices, including the accused Amazon Devices. Amazon represents that Prime Video enables users to stream content "anywhere, anytime," and that it distributes content at scale to support high-concurrency and high-bandwidth video streaming.[26] On information and belief, Amazon regularly delivers Prime Video and Amazon VOD content to users located in the Western District of Texas, and users in this District routinely receive and stream such content.

48.    Amazon has publicly stated that Prime Video relies on Amazon Web Services as the underlying infrastructure for its video delivery operations. According to Amazon, Prime Video uses AWS cloud services and AWS media and networking technologies to encode, package, store, cache, route, and deliver video streams to end users, including for live and on-demand content. In

---

[25] Source: About Amazon, Everything You Need to Know About Prime Video,
https://www.aboutamazon.com/news/entertainment/what-you-need-to-know-about-prime-video
[26] Source: Get the App, https://www.amazon.com/gp/video/splash/getTheApp; Amazon Prime Video Storefront,
https://www.amazon.com/gp/video/storefront/.

delivering Prime Video and Amazon VOD content to users in this District, Amazon makes, uses, operates, and controls distributed content delivery, caching, routing, and configuration-management systems, including its content delivery network and related services. These systems and services are operated in the ordinary course of Amazon's business to deliver video content to users in this District and constitute Accused Instrumentalities that infringe the Asserted Patents, as set forth below.[27]

### C.     Content Delivery Network (CDN) Technology

49.     Content delivery networks (CDNs) emerged as a response to the rapid growth of the Internet and the processing limitations of geographically centralized web server architecture. Early leaders in the CDN market, such as Limelight Networks, deployed strategically located servers in geographic regions that would cache copies of content, to make distribution both more reliable and more efficient. Over time, CDNs became ingrained in infrastructure for large media companies and software distributors as web traffic and digital media—particularly streaming video—expanded rapidly.[28]

50.     Limelight Networks introduced several innovations that helped shape the second generation of CDN services. During this period, Limelight built a large, high-capacity global network designed for high-bitrate media delivery, emphasizing fewer but more PoPs connected by dedicated optical backbone capacity. This architecture was marketed as an efficient and scalable approach for delivering rich media, including Flash-based and live streaming content. Limelight's

---

[27] Source: AWS, Amazon Prime Video Uses AWS to Deliver Solid Streaming Experience, https://aws.amazon.com/solutions/case-studies/amazon-prime-video/
[28] Source: CDN Handbook (https://www.cdnhandbook.com/cdn/history/)

rapid growth culminated in a major initial public offering in June 2007, reflecting investor recognition of its differentiated CDN model and expanding customer base.[29]

51.    Until September 2024, Limelight – later rebranded as Edgio – continued to advance CDN functionality through research and development relating to edge network distribution, software-controlled content delivery workflows, large-scale live event support, and customer-managed content routing.[30]

### D.    Amazon's Web Services Using CloudFront

52.    Defendants did not introduce their CDN offering, Amazon CloudFront, until November 2008—nearly a decade after the first commercial CDNs and several years after providers like Limelight had established global delivery networks and mature media-delivery capabilities. CloudFront was initially introduced as a complementary service layered on top of Amazon S3, designed primarily to accelerate the distribution of content already stored within Amazon's cloud.[31]

53.    Amazon CloudFront operates within the AWS global edge network and integrates with Defendants' accused products and services. CloudFront uses a multi-tier caching architecture that includes edge locations and regional edge caches, and it fetches content from origin servers such as Amazon S3, AWS Elemental MediaPackage, Elastic Load Balancing, or any HTTP server that a customer designates as origin.[32] In 2024, Defendants introduced Amazon CloudFront Embedded PoPs, to "expand the AWSS Global Network" by deploying "turnkey appliances owned

---

[29] Source: The New York Times (https://archive.nytimes.com/dealbook.nytimes.com/2007/06/11/limelight-networks-ipo-brings-home-the-bacon/)
[30] Source: CDN Handbook (https://www.cdnhandbook.com/providers/limelight/)
[31] Source: AWS Blogs (https://aws.amazon.com/blogs/aws/happy-anniversary-amazon-cloudfront-15-years-of-evolution-and-internet-advancements/).
[32] Source: Amazon CloudFront Developer Guide at 7
(https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFront_DevGuide.pdf); *Id.* at 81

by AWS" and "fully managed and supported by Cloudfront" within ISP networks "for delivering popular live-streaming events, VOD releases, and game downloads.[33]"

54.     CloudFront is configured and administered through the AWS Management Console, including AWS System Manager and CloudFront APIs, AWS CLI, and AWS SDKs (i.e., its control plane). Customers can define and create, read, update, delete, and list distributions and related resources using these interfaces.[34]

55.     On the data plane, CloudFront offers features such as Origin Shield—an additional caching layer that consolidates origin requests to reduce load on the origin.[35]

56.     For media workflows that deliver through CloudFront, AWS provides AWS Elemental Media Services, including MediaLive, MediaConnect, MediaPackage, MediaStore, MediaConvert, and MediaTailor. These services prepare, transport, encode, package, originate, and personalize video for live and VOD streaming that can be distributed via CloudFront.[36]

57.     CloudFront includes other services and features such as Amazon EC2, AWS IAM, AWS Lambda, AWS Lambda@Edge, and Amazon DynamoDB.

## BACKGROUND OF THE ASSERTED PATENTS

### A.     U.S. Patent No. 7,921,259

58.     The '259 Patent is valid, enforceable, and directed to patentable subject matter.

59.     The '259 Patent is directed to systems and methods that allow a content provider to control cache-replacement behavior at CDN edge servers through a central system, rather than

---

[33] Source:  https://aws.amazon.com/blogs/networking-and-content-delivery/bringing-delivery-closer-to-end-users-with-amazon-cloudfront-embedded-pops/
[34] Source: Amazon CloudFront API Reference at 2
(https://docs.aws.amazon.com/pdfs/cloudfront/latest/APIReference/cloudfront-api.pdf)
[35] Source: Amazon CloudFront Developer Guide at 252
(https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFront_DevGuide.pdf)
[36] Source: AWS Elemental (https://aws.amazon.com/media-services/elemental)

relying on generic, autonomous cache policies that can remove objects or cause unnecessary origin fetches. Ex. 1 ('259 Patent) at 2:24-33.

60.    Prior to the invention, content owners lacked control over what and how their content was cached in edge server locations. *Id*. at 4:24-33. Moreover, these conventional CDN networks lacked a centralized mechanism to provide edge server locations with a global policy that would dictate what content the content owner wanted purged from the edge location and at what time the content owner wanted a purge to happen. *Id.* at 2:26-33. Additionally, the content owner was unable to provide a global policy that would dictate delivery context (*e.g.*, a policy dictating to what users the content should be delivered). *Id.*

61.    To overcome these shortcomings, the patent provides a central policy control mechanism through which a content owner sets a replacement policy that edge servers of a content delivery network apply to the owner's content. *Id.* at 4:58-5:8. In operation, an edge server that serves a plurality of content providers maintains cache memory (which can include persistent and volatile tiers) and manages admission, retention, partial retention, pre-loading, and purging in accordance with the provider-defined policy disseminated via the central system. *Id.* at 3:13-30; 5:1-5; 2:50-60. The specification explains that such policies can lock specified content against deletion, pre-load files in advance of demand, purge target objects, and, for large media files, retain only portions while removing the remainder so that immediate playback is served from cache and remaining portions are fetched as needed, improving quality of experience while increasing effective cache capacity. *Id.*

62.    The patent further describes that replacement policies may be functions of delivery characteristics such as geographic region, time of delivery, content type, file size, download rate, frequency of access, or cost of replacement, enabling a provider to apply different policies to

different content sets. *Id*. at 3:34-45. In addition, the architecture contemplates cache memory comprising both persistent and volatile layers, with policies governing each tier; and it exposes UI controls that allow the provider to lock, pre-load, or purge content across one or more edge servers. *Id.* at 3:24-30; 8:60-65. These are features not provided by conventional, primarily autonomous replacement schemes at the time.

63.    These technical advancements are reflected in the claims, which recite, for example, "an edge server of a content delivery network that serves a plurality of content providers and having a data store for storing content associated with respective ones of the content providers," and allowing "via a central system for the content delivery network accessible to the plurality of contents providers, a content provider to set a replacement policy at the edge server for controlling the movement of content associated with the respective content provider, into and out of the data store." *Id.* at Claim 1. In other claims, the claimed content delivery system includes "a content server for storing a plurality of content files," that is in communication with an edge server with a replacement policy module including a controller that allows the content owner to set the parameters for updating content stored at the edge server with content cached at the content server. *See* Claims 11, 13.

64.    The combination of steps and elements—including centralized control of the data store and specific replacement policies at the edge server designed to control the movement of content—constitutes a specific, technical solution to an identified problem unique to content delivery networks. The specification demonstrates that the inventors possessed the claimed subject matter and enables one of ordinary skill to implement the invention without undue experimentation.

### B.      U.S. Patent No. 10,116,565

65.      The '565 Patent is valid, enforceable, and directed to patentable subject matter.

66.      The '565 Patent is directed to systems for accelerating delivery of uncached content between PoPs in a content-delivery network. Ex. 2 ('565 Patent) at Abstract, 1:30-35.

67.      Prior to the invention, CDN nodes suffered latency, throughput penalties, and other inefficiencies (*e.g.* cache defects or misses) as a result of conventional long-haul request paths, including repeated TCP and SSL handshakes and the slow-start congestion window. *Id*. at 8:1-10; 8:36-40; 9:1-10. In addition, CDN providers sought ways of offloading traffic served directly from the content provider's origin infrastructure (which imposes throughput costs on both the CDN's delivery system and the content provider's network). *Id*. at 1:20-22. Moreover, existing CDN architectures lacked a viable mechanism to maintain pre-established, inter-PoP connections to eliminate these bottlenecks and instead opened long-haul connections on demand, causing "stale," "slow," or "unreliable" connections. *Id*. at 10:5-15.

68.      To address these issues, the patent provides a system with a first PoP and a second PoP comprising a plurality of edge servers that maintain a persistent or pre-warmed connection to avoid the necessity of re-establishing the connection for each request. *Id*. at 1:43-50; 17:10-20; Claim 9. When a user requests uncached content, the first PoP obtains at least a portion of the content from the second PoP over this pre-existing path. *Id.* at Abstract; 2:1-7. The connection is maintained so that its congestion window has already been increased, enabling high-throughput transmission from the outset and reducing the latency ordinarily associated with uncached content. *Id.* at 17:15-25. The claimed invention has a particular application to dynamic content which previously could not be reliably cached, making long-haul communications of dynamic content unavoidable. *Id*. at 9:9-11.

69.    The specification and figures describe this PoP-to-PoP acceleration architecture: a first PoP positioned at the network edge, a second PoP upstream, and a maintained inter-PoP connection through which the second PoP transmits content portions to the first PoP without connection-setup delays. *Id.* at 1:33-55; 9:65-67; 10:1-15. By keeping the connection, the system avoids slow-start penalties and substantially improves overall transfer times for uncached traffic. *Id*. at 9:12-32. It also permits load-balancing between server locations within the edge server network while promoting the availability of cached content to avoid the necessity of accessing the content origin network. *Id*. at 7:64-9:37, 10:53-64. As set forth in the exemplary connection described in the specification, implementing the claimed invention with a pre-warmed connection "increased the speed of content delivery by on average a factor of 10." *Id*. at 10:62-65.

70.    These technical advancements are reflected in the claims, which recite, for example, "a first PoP in the CDN configured to receive a content request from a user device, wherein the first PoP comprises a first plurality of edge servers," together with "a second PoP in the CDN, wherein the second POP comprises a second plurality of edge servers." Both PoPs' edge servers "store and distribute content in response to user requests." However, "content responsive to the content request comprises a content portion that is not stored in the first PoP". Instead, "the first content portion is available through the second PoP." There is a "persistent connection mesh between the first PoP and the second PoP" that is "maintained between the first PoP and the second POP prior to the content being received by the first PoP" and "the first content portion is transmitted through the persistent connection mesh from the second PoP to the first PoP." *See id.* at Claim 1; Claim 9. The '565 Patent further discloses claims directed to the configuration of the connection between the origin server and the second PoP. *See e.g.*, *id*. at Claims 5, 13.

71.     The combination of steps and elements—including the use of a first and second PoP and a specific type of connection between the first and second PoP designed to increase the congestion window—constitutes a specific, technical solution to an identified problem in content delivery networks. Taken together, these disclosures implement an end-to-end acceleration mechanism for uncached content that is absent from conventional CDN architectures. The specification demonstrates that the inventors possessed the claimed subject matter and enables one of ordinary skill to implement the invention without undue experimentation.

### C.     U.S. Patent No. 8,745,128

72.     The '128 Patent is valid, enforceable, and directed to patentable subject matter.

73.     The '128 Patent is directed to methods for improving content-distribution efficiency by enabling an authoritative DNS server in a hosting system to make server-selection decisions based on the IP address of the end user, rather than inferring user location from the IP address of a recursive resolver. Ex. 3 ('128 Patent) at Abstract, 5:35-50; 7:19-40.

74.     Prior to the invention, conventional DNS-based routing often misidentified the optimal route for distribution of content over a plurality of distributed servers, introducing inefficiency and latency. '128 Patent at 1:45-2:48, 2:61-3:9. The prior art system may identify a CDN server closest to the recursive name server because the resolver's IP address is what appears in standard DNS queries, not the user's IP address. *Id*. at 2:19-50; Fig. 1. As a result, when an end user in one region relies on a remote corporate or ISP resolver in a different region, the CDN assumes the user is co-located with that resolver and may return a non-optimal content delivery path, degrading efficiency and user experience. *Id.*

75.     To overcome these shortcomings, the patent provides a DNS request-routing architecture in which the hosting system's authoritative DNS tier receives a DNS request that

includes the end user's IP address information, extracts the user's IP address information, and then derives and analyzes performance metrics to determine the optimal server from a plurality of distributed servers; the system then updates the DNS configuration so that subsequent resolutions return the IP address of that optimal server for the requesting user. *Id.* at 3:16-30; 7:30-40; 8:40-55. By basing server selection on the actual client IP address information and measurements gathered through active and passive monitoring, the approach removes resolver-location assumptions and provides more accurate traffic steering to reduce overhead while keeping routing decisions current. *Id*. at 3:60-67; 4:1-10; 6:40-50.

76.    The specification and figures describe a DNS-based request-routing architecture comprising: an authoritative DNS tier of the hosting system that receives a DNS request including the end user's IP address, extracts the end user IP address from the DNS message, uses this information to provide an identification parameter, and updates DNS configuration so that subsequent resolutions return the IP address of the optimal server for that user. *Id.* at 6:20-30; 3:16-27; 3:58-65; 2:31-41.

77.    These technical advancements are reflected in the claims, which recite, for example, "with at least an authoritative domain name system (DNS) server of the hosting system comprising a processor and non-transitory computer-readable storage: receiving a DNS request that is modified to include the Internet Protocol (IP) address of the client in addition to or instead of the IP address of a DNS resolver used by the client to forward the DNS request to the authoritative DNS server of the hosting system" and "extracting the IP address of the client from the DNS message." *Id.* at Claim 10. The hosting system continues by "determining an optimal server from the plurality of servers that optimally services the IP address of the client."  The hosting

system finishes the process by "passing an IP address of the optimal server to the client in response to resolving the DNS request." See *id*.

78.     The combination of steps and elements—including forwarding the DNS request to the authoritative DNS server of the hosting system and determining a server from among multiple servers that optimally services the IP address of the client—constitutes a specific, technical solution to an identified problem in content delivery networks. The specification demonstrates that the inventors possessed the claimed subject matter and enables one of ordinary skill to implement the invention without undue experimentation.

**D.     U.S. Patent No. 9,015,416**

79.     The '416 Patent is valid, enforceable, and directed to patentable subject matter.

80.     The '416 Patent is directed to systems and methods for improving the performance of CDN resources by improving usage of the CDN's finite cache capacity. Ex. 4 ('416 Patent) at Abstract, 2:12-24.

81.     Prior to the invention, CDNs commonly relied on standard TTL cache controls, which require edge servers to purge cached content and fetch a fresh copy when TTL parameters expire, adding latency and bandwidth overhead. Simply scaling resources raises costs and yields diminishing returns, creating a need for more efficient caching, validation, and serving of cached content, especially for dynamic content. *Id.* at 1:37-65; 2:25-45; 3:35-45; 6:25-45. The claimed invention improves the efficiency of the storage and transfer of content over a content delivery network by relying on a specific, claimed improvement using checksums to validate cached content – minimizing the resource and time intensive operations of retrieving content from the origin server, updating the content cache at periodic intervals, and purging the cache of expired content.

82.     To overcome shortcoming in the prior art, the patent teaches a checksum-based validation flow that runs in parallel with refresh: when cached content's TTL has expired, the edge server requests both a checksum for the fresh instance and the fresh instance itself from a gateway server; if the returned checksum matches the cached object's checksum, the edge immediately serves the cached object, stops the in-flight transfer, and can reset/update the TTL; if the checksums do not match, the edge continues receiving the fresh object, replaces the cached copy, and serves the fresh instance. *Id*. at 2:54-65; 11:15-30; 3:6-15; 9:1-10. This change-based validation reduces latency, avoids unnecessary origin fetches, and improves cacheability of content by invalidating when the content changes rather than on TTL. *Id.*

83.     The specification describes a two-tier flow: (1) a first-tier CDN edge server holds a cached object whose TTL has expired; (2) it sends two requests to a gateway server, a validation request and a content request for the current instance itself; (3) the gateway returns the validation value first and begins streaming the current object; (4) the edge compares the cached object's stored validation value with the returned one. *Id*. at 2:54-65; 10:25-35; 5: 10-20; 7:60-66. If they match, the edge serves the cached object immediately, terminates the in-flight transfer, and may reset/update the TTL; if they don't match, the edge continues receiving the current object, replaces the cached copy, and serves the new instance. *Id.* at 8:1-15; 8:35-50. In an embodiment, the architecture involves communication between the CDN server and a content provider origin server, wherein the gateway server submits a validation request to the origin server of the content provider that originates the content. *Id*. at 11:34-49. When the gateway server submits a validation request, the origin server responds by submitting a checksum for the fresh instance of the content. If the content has not changed, the gateway server uses the cached content without waiting for a transfer

from the origin server to complete. *Id*. If the checksum indicates that the content has changed, the gateway server obtains the refreshed content with a new checksum from the origin server. *Id*.

84.    The specification further teaches a system wherein, upon either or both a validation request and a content request (*e.g.*, from an end user), a gateway server may perform a cache fill to obtain a fresh instance of the content upon which a checksum is calculated or, alternatively, may determine that the content is already stored in local cache because of a prior request or because the cache content has been automatically refreshed. *Id*. at 7:50-61. Next, "the process compares the checksum for the cached instance of the requested content with the checksum for the fresh instance of the requested content that is received from the gateway server." *Id*. at 8:31-34. "The comparison is an efficient calculation as it merely involves comparing the two checksum values to determine if they are the same or different. *Id*. at 8:34-36. If the checksums do not match, the process continues by receiving the fresh instance of the content and serving it to the end user. *Id*. at 8:37-45. If the checksums match, the process may send the cached instance of the requested content to the user even though the TTL parameter for the cached instance has expired. *Id*. at 8:36-57. Where the checksums match, the system validates that the content matches the content being requested by the end user but avoids the latency and inefficiency of updating the cached content before serving it to the user. *Id*. at 8:58-11. Checksums can be computed for the entire file or for a specific partition of a file, and additional checksums can be computed for later partitions, thereby avoiding the need to compute a checksum for an entire file or for all partitions of the content. *Id*. at 10:53-64. This makes cache refreshing more efficient by applying it to only the part of the file that requires updating. *Id*. Yet another advantage of the claimed system is that it offers a more efficient cache validation policy compared to prior art policies that scan the content in the cache to identify and remove expired content. *Id*. at 10:64-11:7.

85.     These technical advancements are reflected in the claims, which recite, for example, "storing a first checksum identifying a cached instance of particular content," then, after "receiving a first request for the particular content" there is a "second request" that is submitted to "an external source that remotely hosts a fresh instance of the particular content." That "fresh instance" is "representative of a most recent version of the particular content." Then, there is "receiving from the external source, a second checksum identifying the fresh instance of the particular content contemporaneous with commencement of a transfer of the fresh instance." Finally, "when the first checksum matches the second checksum," the cached instance is served "without reference to said transfer from the external source of the fresh instance", and "when the first checksum differs from the second checksum," the fresh instance is served "after or contemporaneous with said transfer of the fresh instance." *See id.* at Claim 1; Claim 13; Claim 19. The claims further disclose terminating the transfer of a fresh instance of content from the external source when the first checksum matches the second checksum (Claim 3) and resetting an expiration parameter for the cached instance of the particular content when the first checksum matches the second checksum (Claim 5).

86.     The combination of steps and elements—including requesting, in parallel, a validation value for the most-current instance and the current instance itself from a surrogate origin, comparing that validation value to a locally stored value identifying the cached instance, serving the cached instance and terminating the in-flight transfer on a match, and serving the fresh instance and replacing the cached copy on a mismatch—constitutes a specific, technical solution to an identified problem in content-delivery networks. The claimed method and system disclose a specific implementation of storing and comparing checksums identifying cached content that improves the manner in which the function of delivering content over a CDN is carried out. The

specification demonstrates that the inventors possessed the claimed subject matter and enables a person of ordinary skill in the art to implement the invention without undue experimentation.

### E.    U.S. Patent No. 8,868,701

87.    The '701 Patent is valid, enforceable, and directed to patentable subject matter.

88.    The '701 Patent is directed to systems and methods for deploying and maintaining the same customer configuration across servers operated by different service providers in a federated content-delivery setting.

89.    Prior to the invention, conventional CDN networks lacked a reliable, centralized way to (i) store configurations for multiple providers, (ii) identify which servers at each provider should receive a given configuration, and (iii) validate and, if necessary, automatically roll back cross-provider deployments based on measured performance, leading to inconsistent behavior across independent infrastructures. Ex. 5 ('701 Patent) at 2:51-3:17; 3:30-38; 3:45-51.

90.    To overcome these shortcomings, the patent provides a configuration management repository that serves as the authoritative control point for such federated deployments. *Id.* at 20:17-43. The patent discloses a data store that maintains a plurality of configurations for a first set of servers operated by a first service provider and a second set of servers operated by a second service provider and identifies which servers in those sets are to deploy each configuration. *Id.* at 20:17-43. A processor then automatedly configures server operation by deploying a selected configuration, including the application, a configuration for customizing the application's parameters, and a configuration for using the application to perform a service on behalf of a customer, to at least one server in each provider's network of servers. *Id.* at 4:6-17; 21:14-19.

91.    The specification's architecture and figures describe a repository-centric design in which a function processor, configuration store, and user interface coordinate creation,

modification, mapping, and deployment of configurations across provider boundaries. *Id.* at 4:6-17; 20:17-43; Fig. 2-3 & Fig. 12. The repository organizes layered configurations, such as operating-system image, application image, application-level configuration, and customer configuration, and maintains mappings from each configuration to specific sets of servers that may span different providers. *Id.* at 4:6-17; 20:17-43; Fig. 2-3; Fig. 12. By pushing the same configuration to the mapped cross-provider targets and collecting deployment status/timestamps and performance metrics from those servers, the system validates success in the field and preserves service quality in federated environments. *Id.*; *see also id.* at 17:4-61.

92.    These technical advancements are reflected in the claims, which recite, for example, "storing a plurality of configurations for a first set of servers that are operated by a first service provider and a second set of servers that are operated by a second service provider," "identifying which servers of the first and second sets of servers are to deploy each configuration of the plurality of configurations", and a processor that can "perform operations comprising automatedly configuring server operation by deploying a particular configuration from the plurality of configurations, wherein deploying the particular configuration comprises deploying an application, a configuration for customizing parameters of said application, and a configuration for using said application to perform a service on behalf of a customer to at least one server of the first set of servers and at least one server of the second set of servers identified by the data store." *Id.* at Claim 1. The claims further disclose providing a user interface to a user that permits the user to specify conditions for the configurations as well as alerts to be deployed when a particular configuration satisfies specified conditions. Claims 5, 6.

93.    The combination of steps and elements—including a measured, deployment workflow for multi-provider CDNs, a centralized repository that determines where a configuration

should run (across providers), and a deployment mechanism for a complete configuration package in a uniform manner—constitutes a specific, technical solution to an identified problem in content delivery networks. The specification demonstrates that the inventors possessed the claimed subject matter and enables one of ordinary skill to implement the invention without undue experimentation.

**F.    U.S. Patent No. 8,583,769**

94.    The '769 Patent is valid and enforceable and directed to patentable subject matter.

95.    The '769 Patent is directed to systems and methods for centrally storing, tracking, and deploying server configurations across a distributed platform, such as a CDN operating a plurality of geographically distributed servers that provide content caching and delivery on behalf of multiple customers.

96.    A known problem for any CDN or distributed platform is how to effectively deploy and manage various configurations for hundreds or thousands of customers, spanning different geographic regions, served by hundreds or thousands of servers and how to ensure synchronization across the servers. Ex. 6 ('769 Patent) at 2:66-3:39. The ability to customize, store, and update multiple configurations for the caching and delivery of content is important because different services (*e.g.*, live video versus video-on-demand) benefit from different policies to maximize performance and reduce cost. In addition, different configurations are necessary to address the differences in caching and distribution requirements imposed by local laws and licensing agreements. Finally, using multiple distribution configurations helps ensure that a breakdown or flaw in any particular configuration will not result in loss of service or content access for all users. Prior art techniques for deploying and maintaining configuration of the caching and distribution policies relied on manually configuring or updating constituent edge servers and/or using a central

database to push configurations to multiple server locations. *Id*. However, the shortcomings of the prior art include extensive downtime for server reconfiguration, errors caused by multiple users modifying the same configuration at the same time, scalability, inability to perform incremental updates without completely overwriting the configuration, and propagating updates without the ability to easily revert to a prior configuration (or a part of a prior configuration). *Id*.

97.     To overcome these shortcomings, the patent specification provides a configuration management repository that maintains (a) a plurality of configurations and (b) a plurality of mappings identifying the different sets of servers running each configuration. *Id.* at 4:6-17. Upon "receiving a modification" to a particular configuration, the repository retrieves the corresponding mapping and deploys the modified configuration to the identified server set, expressly modifying the particular configuration already deployed so as to alter content caching and delivery functions at those servers. *See, e.g.*, *id.* at 14:41-55. In this way, the repository serves as a single source for what configuration is live, where it is live, and how to propagate changes across a live, distributed production fleet. *E.g.*, *id.* at 4:51-5:21.

98.     The patent further discloses versioning and integrity controls around those configuration changes. *Id.* For example, the repository can store both the unmodified and modified versions of a configuration with distinct version identifiers, monitor content-caching and delivery performance under each version, and automatically revert to the prior version when performance under the modified version is worse. *Id*. at 5:22-6:62.

99.     These technical advancements are reflected in the claims, which recite, for example, "storing a plurality of configurations and a plurality of mappings identifying different sets of the plurality of servers to which each configuration of the plurality of the configurations is deployed," where "each configuration specifying different customized content caching and

delivery operation for a set of servers that is deployed with that configuration" "receiving a modification to a particular configuration of the plurality of configurations," "retrieving a particular mapping for the particular configuration from the plurality of mappings, the particular mapping identifying a set of servers from the plurality of servers to which said particular configuration is deployed" and "automatedly deploying the particular configuration comprising the received modification to the set of servers identified from the particular mapping, said deploying comprising modifying the particular configuration already deployed to the set of servers to alter content caching and delivery functions of the set of servers according to the received modification." *Id.* at Claim 1. The claims further disclose a user specifying a custom value for a unique, modified version of a particular configuration that is maintained along with an unmodified version of the configuration that is assigned a different number. Claims 2-4.

100.    The combination of steps and elements—including the specific parameters used to alter content caching and deliver functions as well as deploying configuration mapping—constitutes a specific, technical solution to an identified problem in content delivery networks. The specification demonstrates that the inventors possessed the claimed subject matter and enables one of ordinary skill to implement the invention without undue experimentation.

## COUNT I - INFRINGEMENT OF U.S. PATENT NO. 7,921,259

101.    InterDigital incorporates by reference the allegations of all preceding paragraphs as if fully restated herein.

102.    Defendants infringed and continue to infringe, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products and/or services, including

at least Amazon CloudFront,[37] with Origin Shield, and associated cache-control and management services, and/or inducing others to do the same. Amazon derives revenue from the activities relating to Amazon CloudFront, including at least Amazon CloudFront and associated cache-control and management services.

103.    As illustrated in Exhibit 7, Defendants infringe at least Claim 11 of the '259 Patent by providing Amazon Media Services such as Prime Live or Prime VOD via Amazon CloudFront, including delivering Amazon Media Services using CloudFront and Origin Shield. To the extent any limitation is not literally met in Exhibit 7, Defendants infringe under the doctrine of equivalents because any differences are insubstantial and/or the Accused Instrumentalities perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed elements.

104.    Defendants took the above actions intending to infringe and/or cause infringing acts by their users. For example, Defendants actively, knowingly, and intentionally induce infringement of the '259 Patent by encouraging and instructing customers, partners, and users to configure and use the Accused Instrumentalities in ways that practice one or more claims of the '259 Patent, including through documentation, promotional materials and instructions, developer guides, console workflows, solution briefs, marketing, training, tutorials, and technical support. Defendants knew or were willfully blind to the fact that such actions would induce infringement. *See, e.g.*:

---

[37] Many Amazon AWS Services, for example, Amazon Media Services, utilize Amazon CloudFront for distribution of media. Source: Amazon CloudFront Developer Guide at 700 (https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFront_DevGuide.pdf)

**Manage how long content stays in the cache (expiration)**

You can control how long your files stay in a CloudFront cache before CloudFront forwards another request to your origin. Reducing the duration allows you to serve dynamic content. Increasing the duration means that your users get better performance because your files are more likely to be served directly from the edge cache. A longer duration also reduces the load on your origin.

Typically, CloudFront serves a file from an edge location until the cache duration that you specified passes—that is, until the file expires. After it expires, the next time the edge location gets a request for the file, CloudFront forwards the request to the origin to verify that the cache contains the latest version of the file. The response from the origin depends on whether the file has changed:

- If the CloudFront cache already has the latest version, the origin returns a status code 304 Not Modified.

- If the CloudFront cache does not have the latest version, the origin returns a status code 200 OK and the latest version of the file.

Source:        Amazon        CloudFront        Developer        Guide        at        270
(https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFr
ont_DevGuide.pdf)

We recommend managing your cache duration by updating your distribution's cache policy. If you opt out of using a cache policy, the default TTL (Time to Live) is 24 hours, but you can update the following settings to override the default:

- To change the cache duration for all files that match the same path pattern, you can change the CloudFront settings for **Minimum TTL**, **Maximum TTL**, and **Default TTL** for a cache behavior. For information about the individual settings, see Minimum TTL, Maximum TTL, and Default TTL.
- To change the cache duration for an individual file, you can configure your origin to add a Cache-Control header with the max-age or s-maxage directive, or an Expires header to the file. For more information, see Use headers to control cache duration for individual objects.

Source: *Id*. at 271.

105.    On information and belief, Defendants have contributed to infringement of the '259 Patent by offering and providing components of the Accused Instrumentalities, including software, services, and policy/configuration artifacts, that constitute material parts of the claimed invention, are especially made or especially adapted for use in an infringement of the '259 Patent, and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

106.    On information and belief, Defendants had knowledge of the '259 Patent and of the infringement at least as of the filing of this Complaint. Defendants' continued infringement despite such knowledge renders this an exceptional case and supports an award of enhanced damages.

107.    InterDigital has been and continues to be damaged by Defendants' infringement of the '259 Patent and is entitled to damages adequate to compensate for such infringement, in no event less than a reasonable royalty, together with pre- and post-judgment interest and costs.

108.    InterDigital provides the foregoing explanation of infringement with regard to exemplary functionality and exemplary claims. InterDigital reserves the right to present additional and/or alternative explanations of infringement for other claims and functionalities, and to amend this Count, as discovery progresses.

### COUNT II - INFRINGEMENT OF U.S. PATENT NO. 10,116,565

109.    InterDigital incorporates by reference the allegations of all preceding paragraphs as if fully restated herein

110.    Defendants have infringed and continue to infringe, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products and/or services, including at least Amazon CloudFront and associated PoP-to-PoP and PoP-to-origin connectivity and caching infrastructure as well as products and services that use or incorporate the same.

111.    As illustrated in Exhibit 8, Defendants infringe at least Claim 9 of the '565 Patent by enabling CloudFront together with one or more of Regional Edge Caches, Origin Shield and/or mid-tier caches, PoP interconnects, and related network and transport mechanisms. To the extent any limitation is not literally met in Exhibit 8, Defendants infringe under the doctrine of equivalents because any differences are insubstantial and/or the Accused Instrumentalities perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed elements.

112.    Defendants took the above actions intending to infringe and/or cause infringing acts by their users. For example, Defendants have actively, knowingly, and intentionally induced

infringement of the '565 Patent by encouraging and instructing customers, partners, and users to configure and use the Accused Instrumentalities in ways that practice one or more claims of the '565 Patent, including through documentation, promotional materials and product instructions, developer guides, console workflows, solution briefs, marketing, training, tutorials, and technical support. Defendants knew or were willfully blind to the fact that such actions would induce infringement. *See, e.g.*:



Source:        Amazon        CloudFront        Developer        Guide        at        10 (https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFront_DevGuide.pdf)



Source: *Id.* at 8.

113.    On information and belief, Defendants have contributed to infringement of the '565 Patent by offering and providing components of the Accused Instrumentalities, including software, services, and policy/configuration artifacts, that constitute material parts of the claimed invention, are especially made or especially adapted for use in an infringement of the '565 Patent, and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

114.    On information and belief, Defendants have had knowledge of the '565 Patent and of the infringement at least as of the filing of this Complaint. Defendants continued infringement despite such knowledge renders this an exceptional case and supports an award of enhanced damages.

115.    InterDigital has been and continues to be damaged by Defendants' infringement of the '565 Patent and is entitled to damages adequate to compensate for such infringement, in no event less than a reasonable royalty, together with pre- and post-judgment interest and costs.

116.    InterDigital provides the foregoing explanation of infringement with regard to exemplary functionality and exemplary claims. InterDigital reserves the right to present additional and/or alternative explanations of infringement for other claims and functionalities, and to amend this Count, as discovery progresses.

## COUNT III - INFRINGEMENT OF U.S. PATENT NO. 8,745,128

117.    InterDigital incorporates by reference the allegations of all preceding paragraphs as if fully restated herein.

118.    Defendants have infringed and continue to infringe, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products and/or services,

including at least Amazon Route 53 and related DNS-based routing features and integrations used with CloudFront as well as products and services that use or incorporate the same.

119.    As illustrated in Exhibit 9, Defendants infringe at least Claim 10 of the '128 Patent by enabling CloudFront together with Amazon Route 53, which can be used to map domain names to other AWS resources like load balancers, Amazon EC2 instances, and Amazon S3 buckets. To the extent any limitation is not literally met in Exhibit 9, Defendants infringe under the doctrine of equivalents because any differences are insubstantial and/or the Accused Instrumentalities perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed elements.

120.    Defendants took the above actions intending to infringe and/or cause infringing acts by their users. For example, Defendants have actively, knowingly, and intentionally induced infringement of the '128 Patent by encouraging and instructing customers, partners, and users to configure and use the Accused Instrumentalities in ways that practice one or more claims of the '128 Patent, including through documentation, promotional materials and instructions, developer guides, console workflows, solution briefs, marketing, training, tutorials, and technical support. Defendants knew or were willfully blind to the fact that such actions would induce infringement. *See, e.g.*:

**Amazon Prime Video Uses AWS to Deliver Solid Streaming Experience to More Than 18 Million Football Fans**

**Searching for the Right Sports-Streaming Solution**

When Amazon Prime Video won the rights to stream NFL Thursday Night Football games in more than 200 countries, it knew it needed to provide the best possible experience for millions of fans watching their favorite teams. "With live sporting events, reliability and low latency are absolutely critical because every lost second negatively impacts viewers," explains BA Winston, the global head of digital video playback and delivery for Amazon Video. "If there are any interruptions or buffering, the fans won't watch."

On top of that challenge, Amazon Prime Video had to make sure it could easily and quickly support large spikes in user traffic. "Although we have several mechanisms to forecast demand, we cannot be completely accurate," says Winston. "Therefore, we needed to do sufficient scale testing and have an architecture that can quickly scale, handle spikes, and have sufficient caching in different layers to manage the demand."

The organization also needed to offer targeted advertising during games and be able to track ad data so that advertisers could gauge how effectively ads were performing.

Source: AWS Customer Stories (https://aws.amazon.com/solutions/case-studies/amazon-prime-video/)

The Thursday Night Football platform takes advantage of additional AWS services, including Amazon CloudFront for delivering video with low latency to a global viewership, and Amazon Elastic Compute Cloud (Amazon EC2) for managing compute capacity. Zhang says, "We worked very closely with the compute team to provision capacity that can elastically scale for such a global audience."

*Id.*



**AWS Services Used**

**Amazon DynamoDB**
Amazon DynamoDB is a serverless, fully managed, distributed NoSQL database with single-digit millisecond performance at any scale.

**Amazon CloudFront**
Amazon CloudFront is a fast content delivery network (CDN) service that securely delivers data, videos, applications, and APIs to customers globally with low latency, high transfer speeds, all within a developer-friendly environment.

**Amazon EC2**
Amazon Elastic Compute Cloud (Amazon EC2) is a web service that provides secure, resizable compute capacity in the cloud. It is designed to make web-scale cloud computing easier for developers.

*Id.*



Source:      Amazon      Route      53      Developer      Guide      at      24
(https://docs.aws.amazon.com/pdfs/Route53/latest/DeveloperGuide/route53-dg.pdf)

121.    On information and belief, Defendants have contributed to infringement of the '128 Patent by offering and providing components of the Accused Instrumentalities, including software, services, and policy/configuration artifacts, that constitute material parts of the claimed invention, are especially made or especially adapted for use in an infringement of the '128 Patent, and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

122.    On information and belief, Defendants have had knowledge of the '128 Patent and of the infringement at least as of the filing of this Complaint. Defendants' continued infringement despite such knowledge renders this an exceptional case and supports an award of enhanced damages.

123.    InterDigital has been and continues to be damaged by Defendants' infringement of the '128 Patent and is entitled to damages adequate to compensate for such infringement, in no event less than a reasonable royalty, together with pre- and post-judgment interest and costs.

124.    InterDigital provides the foregoing explanation of infringement with regard to exemplary functionality and exemplary claims. InterDigital reserves the right to present additional and/or alternative explanations of infringement for other claims and functionalities, and to amend this Count, including to add claim-by-claim charts, as discovery progresses.

### COUNT IV - INFRINGEMENT OF U.S. PATENT NO. 9,015,416

125.    InterDigital incorporates by reference the allegations of all preceding paragraphs as if fully restated herein.

126.    Defendants have infringed and continue to infringe, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products and/or services, including at least Amazon CloudFront and associated caching and origin-fetch infrastructure as well as products and services that use or incorporate the same.

127.    As illustrated in Exhibit 10, Defendants infringe at least Claim 19 of the '416 Patent by enabling CloudFront together with origin servers (such as S3 or AWS Elemental MediaPackage) and edge caches that, upon TTL expiration, obtain an upstream ETag/checksum, compare it to the cached object's identifier, retain TTL if they match, or replace the cached object and update the identifier if they differ. To the extent any limitation is not literally met in Exhibit 10, Defendants infringe under the doctrine of equivalents because any differences are insubstantial and/or the Accused Instrumentalities perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed elements.

128.    Defendants took the above actions intending to infringe and/or cause infringing acts by their users. For example, Defendants have actively, knowingly, and intentionally induced infringement of the '416 Patent by encouraging and instructing customers, partners, and users to configure and use the Accused Instrumentalities in ways that practice one or more claims of the

'416 Patent, including through documentation, promotional materials and instructions, developer guides, console workflows, solution briefs, marketing, training, tutorials, and technical support. Defendants knew or were willfully blind to the fact that such actions would induce infringement. *See, e.g.*:



Source:        Amazon        CloudFront        Developer        Guide        at        8 (https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFront_DevGuide.pdf)



Source: Managing content delivery across multiple AWS Elemental MediaPackage origins (https://aws.amazon.com/blogs/media/metfc-managing-content-delivery-across-multiple-aws-elemental-mediapackage-origins/)

129.    On information and belief, Defendants have contributed to infringement of the '416 Patent by offering and providing components of the Accused Instrumentalities, including software, services, and policy/configuration artifacts, that constitute material parts of the claimed invention, are especially made or especially adapted for use in an infringement of the '416 Patent, and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

130.    On information and belief, Defendants have had knowledge of the '416 Patent and of its infringement at least as of the filing of this Complaint. Defendants' continued infringement despite such knowledge renders this an exceptional case and supports an award of enhanced damages.

131.    InterDigital has been and continues to be damaged by Defendants' infringement of the '416 Patent and is entitled to damages adequate to compensate for such infringement, in no event less than a reasonable royalty, together with pre- and post-judgment interest and costs.

132.    InterDigital provides the foregoing explanation of infringement with regard to exemplary functionality and exemplary claims. InterDigital reserves the right to present additional and/or alternative explanations of infringement for other claims and functionalities, and to amend this Count, including to add claim-by-claim charts, as discovery progresses.

### COUNT V - INFRINGEMENT OF U.S. PATENT NO. 8,868,701

133.    InterDigital incorporates by reference the allegations of all preceding paragraphs as if fully restated herein.

134.    Defendants have infringed and continue to infringe, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products and/or services,

including at least Amazon CloudFront with its features that create and propagate configurations and Lambda@Edge to deploy applications as well as products and services that use or incorporate the same.

135.    As illustrated in Exhibit 11, Defendants infringe at least Claim 1 of the '701 Patent by enabling CloudFront with configuration-propagation features and features such as Lambda@Edge to deploy applications across identified server sets. To the extent any limitation is not literally met in Exhibit 11, Defendants infringe under the doctrine of equivalents because any differences are insubstantial and/or the Accused Instrumentalities perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed elements.

136.    Defendants took the above actions intending to infringe and/or cause infringing acts by their users. For example, Defendants have actively, knowingly, and intentionally induced infringement of the '701 Patent by encouraging and instructing customers, partners, and users to configure and use the Accused Instrumentalities in ways that practice one or more claims of the '701 Patent, including through documentation, developer guides, console workflows, solution briefs, marketing, training, tutorials, and technical support. Defendants knew or were willfully blind to the fact that such actions would induce infringement. *See, e.g.,*

**Overview: Creating and using Lambda functions with CloudFront**

1. Create a Lambda function in the US East (N. Virginia) Region.

2. Save and publish a numbered version of the function.

   If you want to change the function, you must edit the $LATEST version of the function in the US East (N. Virginia) Region. Then, before you set it up to work with CloudFront, you publish a new numbered version.

3. Associate the function with a CloudFront distribution and cache behavior. Then specify one or more CloudFront events (*triggers*) that cause the function to execute. For example, you can create a trigger for the function to execute when CloudFront receives a request from a viewer.

4. When you create a trigger, Lambda creates replicas of the function at AWS locations around the world.

Source:     Amazon     CloudFront     Developer     Guide     at     893 (https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFront_DevGuide.pdf)

Amazon CloudFront                                          Developer Guide

When you save changes to your distribution configuration, CloudFront starts to propagate the changes to all edge locations. Successive configuration changes propagate in their respective order. Until your configuration is updated in an edge location, CloudFront continues to serve your content from that location based on the previous configuration. After your configuration is updated in an edge location, CloudFront immediately starts to serve your content from that location based on the new configuration.

Your changes don't propagate to every edge location at the same time. While CloudFront is propagating your changes, we can't determine whether a given edge location is serving your content based on the previous configuration or the new configuration.

Source: *Id*. at 163.

137.    On information and belief, Defendants have contributed to infringement of the '701 Patent by offering and providing components of the Accused Instrumentalities, including software, services, and policy/configuration artifacts, that constitute material parts of the claimed invention, are especially made or especially adapted for use in an infringement of the '701 Patent, and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

46

138.    On information and belief, Defendants have had knowledge of the '701 Patent and of the infringement at least as of the filing of this Complaint. Defendants' continued infringement despite such knowledge renders this an exceptional case and supports an award of enhanced damages.

139.    InterDigital has been and continues to be damaged by Defendants' infringement of the '701 Patent and is entitled to damages adequate to compensate for such infringement, in no event less than a reasonable royalty, together with pre- and post-judgment interest and costs.

140.    InterDigital provides the foregoing explanation of infringement with regard to exemplary functionality and exemplary claims. InterDigital reserves the right to present additional and/or alternative explanations of infringement for other claims and functionalities, and to amend this Count, including to add claim-by-claim charts, as discovery progresses.

### COUNT VI - INFRINGEMENT OF U.S. PATENT NO. 8,583,769

141.    InterDigital incorporates by reference the allegations of all preceding paragraphs as if fully restated herein.

142.    Defendants have infringed and continue to infringe, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271, by making, using, selling, and/or offering for sale in the United States or importing into the United States infringing products and/or services, including at least Amazon CloudFront and associated configuration-management and deployment features used with CloudFront, as well as products and services that use or incorporate the same.

143.    As illustrated in Exhibit 12, Defendants infringe at least Claim 1 of the '769 Patent by enabling CloudFront to store configurations with mappings to servers, receive a modification to a configuration, retrieve the corresponding mapping, and automatically deploy the configuration, thereby changing the cache behavior at the edge. To the extent any limitation is not literally met in Exhibit 12, Defendants infringe under the doctrine of equivalents because any

differences are insubstantial and/or the Accused Instrumentalities perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed.

144.    Defendants took the above actions intending to infringe and/or cause infringing acts by their users. For example, Defendants have actively, knowingly, and intentionally induced infringement of the '769 Patent by encouraging and instructing customers, partners, and users to configure and use the Accused Instrumentalities in ways that practice one or more claims of the '769 Patent, including through documentation, promotional materials and instructions, developer guides, console workflows, solution briefs, marketing, training, tutorials, and technical support. Defendants knew or were willfully blind to the fact that such actions would induce infringement. *See, e.g.*:



Amazon         CloudFront         Developer         Guide         at         2
(https://docs.aws.amazon.com/pdfs/AmazonCloudFront/latest/DeveloperGuide/AmazonCloudFr
ont_DevGuide.pdf)

145.    On information and belief, Defendants have contributed to infringement of the '769
Patent by offering and providing components of the Accused Instrumentalities, including software,
services, and policy/configuration artifacts, that constitute material parts of the claimed invention,
are especially made or especially adapted for use in an infringement of the '769 Patent, and are
not staple articles or commodities of commerce suitable for substantial non-infringing use.

146.    On information and belief, Defendants have had knowledge of the '769 Patent and
of the infringement at least as of the filing of this Complaint. Defendants' continued infringement
despite such knowledge renders this an exceptional case and supports an award of enhanced
damages.

147.    InterDigital has been and continues to be damaged by Defendants' infringement of
the '769 Patent and is entitled to damages adequate to compensate for such infringement, in no
event less than a reasonable royalty, together with pre- and post-judgment interest and costs.

148.    InterDigital provides the foregoing explanation of infringement with regard to
exemplary functionality and exemplary claims. InterDigital reserves the right to present additional
and/or alternative explanations of infringement for other claims and functionalities, and to amend
this Count, including to add claim-by-claim charts, as discovery progresses.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of any and all issues triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in its favor and
against Defendants and to grant the following relief:

A. A judgment that Defendants have infringed, either literally and/or under the doctrine of equivalents, U.S. Patent Nos. 7,921,259; 10,116,565; 8,745,128; 9,015,416; 8,868,701; and 8,583,769;

B. A judgment and order finding that Defendants' infringement has been willful;

C. A permanent injunction prohibiting Defendants, their officers, agents, servants, employees, attorneys, and those in active concert or participation with them, from further acts of infringement of the Asserted Patents;

D. An award of damages sufficient to compensate Plaintiffs for Defendants' infringement of the Asserted Patents, but in no event less than a reasonable royalty, together with supplemental damages for post-verdict infringement, and pre-judgment and post-judgment interest and costs;

E. Enhanced damages pursuant to 35 U.S.C. § 284;

F. A judgment and order declaring that this case is exceptional within the meaning of 35 U.S.C. § 285 and awarding Plaintiffs its reasonable attorneys' fees and expenses; and

G. Such other and further relief as the Court may deem just and proper under the circumstances.

Dated: February 23, 2026

Respectfully submitted,

By:  /s/ M. Scott Stevens

M. Scott Stevens (NC 37828)
Erin Beaton (NC 59594)
**ALSTON & BIRD, LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Telephone: (704) 444-1000
scott.stevens@alston.com
erin.beaton@alston.com

John D. Haynes (to be admitted *Pro Hac Vice*)
**ALSTON & BIRD, LLP**
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
john.haynes@alston.com

Elliot C. Riches (TX 24125381)
**ALSTON & BIRD, LLP**
2200 Ross Ave, Suite 2300
Dallas, TX 75201
Telephone: (214) 992-3400
elliott.riches@alston.com

Philip Ducker (to be admitted *Pro Hac Vice*)
Michelle A. Clark (to be admitted *Pro Hac Vice*)
**ALSTON & BIRD, LLP**
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
phil.ducker@alston.com
michelle.clark@alston.com

David M. Stein (TX 00797494)
**OLSON STEIN, LLP**
240 Nice Lane #301
Newport Beach, CA 92663
Telephone: (949) 887-4600
dstein@olsonstein.com

*Counsel for Plaintiffs InterDigital, Inc.*
*and DRNC Holdings, Inc.*